Argued and submitted January 22, reversed and remanded March 19, petition for review denied July 15, 1997 (325 Or 491)

Jack C. HOWARD,
*Appellant,*

*v.*

WAREMART, INC.,
an Idaho corporation,
*Respondent.*

(95C-10262; CA A92970)

935 P2d 432

Brian A. Buchanan argued the cause and filed the briefs for appellant.

Jim Westwood argued the cause for respondent. On the brief were Thomas C. Sand, Sharon L. Toncray and Miller, Nash, Wiener, Hager & Carlsen LLP.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

A jury found defendant liable in damages for common-law wrongful discharge. Plaintiff appeals and assigns error to the granting of defendant's motion for a directed verdict on the issue of punitive damages, ORCP 60, and to a jury instruction on the issue of economic damages. We reverse and remand.

Plaintiff, a former meat cutter in one of defendant's supermarkets, alleged in his complaint that defendant fired him in retaliation for his reporting to senior management that his immediate supervisor

> "was violating public health and safety regulations by having bacteria-ridden bad meat, which had aged beyond its expiration date, reground along with fresh meat so that the bad meat could be sold to customers without their knowledge."

Plaintiff sought both economic and punitive damages. At the conclusion of plaintiff's case, defendant moved for a directed verdict on the issue of liability for wrongful discharge, which the court denied. Defendant then moved for a directed verdict on the issue of punitive damages, which the court granted. Ultimately, the jury found defendant liable and awarded plaintiff $2 in economic damages.

First, we address plaintiff's assignment of error on punitive damages. In determining whether the trial court erred in directing a verdict for defendant on the issue of punitive damages, we view the evidence in the light most favorable to plaintiff, the nonmoving party, and give him the benefit of every reasonable inference that the trier of fact could draw from the evidence. *Shockey v. City of Portland*, 313 Or 414, 422-23, 837 P2d 505 (1992).

A reasonable trier of fact could find these facts. When defendant discharged him, plaintiff had nearly 30 years' experience in the meat industry, several as a quality control supervisor. Plaintiff worked for defendant as a journeyman meat cutter for several years before Doug Boddy became his immediate supervisor. During that time, plaintiff received one disciplinary notice. Shortly after Boddy was

placed in charge of the meat department, he began to extend the expiration dates on three- and four-day packages of ground beef to six and eight days. One of plaintiff's coworkers reported this practice to Boddy's supervisor, who ordered Boddy to stop. However, the coworker was immediately transferred to another store.

Later, plaintiff questioned Boddy about his practices regarding the processing of ground meat. Plaintiff believed that Boddy's directions to mix outdated meat into the "fresh grind" resulted in the offering of dangerous meat for sale to the public. Even though plaintiff brought his concerns to Boddy's attention, the practice continued. Shortly thereafter, Boddy began issuing disciplinary warnings to plaintiff about his job performance. While Boddy was plaintiff's supervisor, plaintiff received eight disciplinary notices between July 1991 and February 1992.[1]

Plaintiff asked for a transfer to another store, and Boddy told a coworker that he would cause defendant to be fired before he allowed a transfer. Once, after Boddy had disciplined plaintiff for grinding up too much fresh meat, plaintiff explained to Boddy's supervisors that the source of the problem was Boddy's excessive purchases of meat, which resulted in the meat becoming unusable before it could be sold. According to plaintiff, the store manager informed plaintiff in response to the information that, "If I want to keep my job, the best thing I can do for me is to keep my mouth shut and do what I was told." A disciplinary notice signed by one of Boddy's superiors reads:

> "[Plaintiff] needs to make more of an effort to properly communicate with the meat dept. manager and assistant manager. Problems with making proper amounts of ground beef, temper tantrums, and gossiping were discussed. Solutions were discussed and [plaintiff] agreed that he needed

---

[1] Three of those notices were issued by Boddy on one day. There is a handwritten note on the notices signed by Boddy's superior and dated the day before Boddy left defendant's employ. The note says:

> "As of the above date, these 3 personnel file entries are rescinded. It's my opinion that these warnings were not done in the professional manner consistent with [defendant's] policy."

There is evidence that although the notices were "rescinded," they remained in plaintiff's personnel file.

to work more within the system to develop a better working atmosphere."

On one occasion, Boddy ordered plaintiff to grind meat that plaintiff believed to be outdated, and when plaintiff refused, he issued a disciplinary notice. When the store manager came to the meat department to discipline plaintiff, he showed her the meat that Boddy had ordered to be ground. She ordered that the meat be thrown out. On another occasion, Boddy issued plaintiff a disciplinary notice for failing to grind enough beef on the day of a sale. When plaintiff pointed out that Boddy had failed to order enough meat and that plaintiff had ground all that was available, Boddy responded, "Oops." Nonetheless, that disciplinary notice remained in plaintiff's file. Boddy also issued plaintiff a disciplinary notice for an error to which one of plaintiff's coworkers admitted.

While Boddy was manager of the meat department, he received several awards from defendant, including cash bonuses and free trips, due in part to his profitable management of the meat department. Boddy eventually left defendant's employ for reasons unrelated to this case. About 18 months after Boddy left defendant, defendant received a complaint from a customer that plaintiff had been rude to her. Plaintiff had received no disciplinary notices since Boddy left. Defendant fired plaintiff. The termination notice said:

> "[Plaintiff] is being discharged immediately for violation of company personnel policies article 1.1, extend courtesy to customers at all times and article 1.6, do quality work and follow directives of supervision. [Plaintiff] has received multiple prior warnings."

None of the "prior warnings" in plaintiff's personnel file was for being discourteous to a customer.

Defendant's agents who made the decision to fire plaintiff were the same management personnel to whom plaintiff had reported his concerns about Boddy selling outdated meat. Each of those managers had initiated and/or witnessed at least one of the eight disciplinary notices issued while Boddy was plaintiff's supervisor. Plaintiff's theory of the case is that he was fired for reporting the sale of outdated

meat to the public, not because he was discourteous on one occasion to a customer.

■     This case comes to us in a procedural posture where the trial court denied defendant's motion for a directed verdict on the issue of liability but allowed its motion regarding punitive damages. Defendant does not cross-appeal the court's ruling on its motion for a directed verdict on the issue of liability. In view of the jury's verdict for plaintiff, the trial court's ruling that plaintiff made out a claim for wrongful discharge remains unchallenged. Thus, the only question raised by plaintiff's assignment of error is whether the trial court erred in removing the issue of punitive damages from the jury in light of the fact that the court permitted the issue of liability to go to the jury. Punitive damages are to "punish a willful, wanton or malicious wrongdoer and to deter that wrongdoer and others similarly situated from like conduct in the future." *Friendship Auto v. Bank of Willamette Valley*, 300 Or 522, 532, 716 P2d 715 (1986).[2] Malice, in the context of punitive damages in civil cases, is "the intentional doing of [an] injurious act without justification or excuse." *Id.* at 535.

The evidence would permit the jury to infer that defendant approved of Boddy's practices of selling outdated meat to the public. Plaintiff presented evidence that after he reported Boddy's unsafe practices, the store manager threatened to discharge plaintiff if he did not remain silent about defendant's practices. Even though there is evidence that defendant rescinded some of the disciplinary notices to plaintiff made by Boddy, there is also evidence that they remained in his personnel file and were used to support defendant's discharge on a pretext. All of the evidence supports a reasonable inference that, after plaintiff reported Boddy's unsafe practices, defendant's agents intentionally undertook to "pad" plaintiff's personnel file with specious disciplinary notices in order to remove a "whistle blower" from their midst, similar to their action in which they had plaintiff's coemployee transferred. The statement in the termination notice that plaintiff "has received multiple warnings," when

---

[2] This action was commenced before ORS 18.537 became effective, so we apply the law as it stood before the adoption of the statute. ORS 18.537 imposes standards for the award and the review of an award of punitive damages.

in fact he had not previously been disciplined for discourteous treatment of a customer, further supports that inference.

The discharge of an employee by a seller of meat to the public in retaliation for reporting a supervisor's practices of regrinding bacteria-ridden, outdated meat and offering it for sale could be found to be an act done with "malice," *i.e.*, one that is without justification or excuse. We hold that, should a jury find plaintiff's version of the events leading up to his discharge credible, the law would permit it to award punitive damages against defendant. The trial court erred when it granted defendant's motion.

■ Plaintiff next assigns error to the court's jury instructions on the issue of economic damages. Plaintiff presented evidence that if he had remained in his position with defendant, he would have earned wages and benefits of approximately $92,500 and that after being fired, he earned approximately $74,000 over the same time period. The trial court instructed the jury:

"If you find from the evidence and the instructions that the Plaintiff is entitled to prevail, then it becomes your duty to decide whether Plaintiff has been damaged, and if so, the amount of his damages.

"In deciding the amount of any damages, you must determine each of the items of plaintiff's damages that I am now about to mention, provided you find that he has sustained the damages as a result of the Defendant's fault. Plaintiff must prove each item of damage by a preponderance of the evidence.

"The mere fact that I am instructing you with regard to the measure of damages is not to be considered by you as an attempt by the Court to suggest or indicate that you should or should not award damages.

"The type of damages which is claimed and recoverable in a claim—in a case like this is what we call economic damages. Economic damages are objectively verifiable monetary losses incurred by the Plaintiff and caused by the Defendant.

"A plaintiff has the burden of proving economic damages by a preponderance of the evidence. In determining the amount of economic damages, if any, consider the

amount of lost income sustained by Plaintiff since his discharge to date. And again, the mere fact that I am instructing you on this damage should not be taken to mean that Plaintiff is entitled to damages. In this case, *the economic damages may not exceed the total sum of $18,513.75.*

"Any person who claims damages as a result of an alleged wrongful act on the part of another has a duty under the law to mitigate those damages, that is, to reduce or minimize the loss or damage. So *if you find that [Plaintiff] is entitled to damages, you should reduce those damages by the amount that he actually earned at other employment after he left* [defendant].

"Additionally, if the Plaintiff failed to reasonably seek or accept other employment opportunities available to him after he left [defendant], you should reduce his damages by the amount that he could have earned by taking advantage of such opportunities." (Emphasis supplied.)

After the court excused the jury, plaintiff excepted to the instructions.

"I think inadvertently as far as everyone, and certainly the Court is concerned, a serious error was made in the instructing of damages to the jury in that the damages figure that Plaintiff has of $18,000 and something dollars was calculated by already adding—already figuring in [plaintiff's] income since his discharge. That was already subtracted. And then the Court instructed the jury to take that number and subtract out everything that he had earned since he left [defendant], which would give him absolutely nothing * * *."

The trial court responded, "I disagree with you but I'll note your exception."

A judgment is reversible on the basis of improper jury instructions when we "can fairly say that the instructions probably created an erroneous impression of the law in the minds of the jurors which affected the outcome of the case." *Waterway Terminals v. P.S. Lord,* 256 Or 361, 370, 474 P2d 309 (1970). We consider the claim of error in light of the instructions as a whole. *Id.* The evidence about what plaintiff could have made and did make is essentially uncontroverted. There is little or no evidence to support the award of only $2 as an amount of compensatory damages. Defendant argues

that the jury's verdict could reflect a finding that it did not believe his version of the evidence, or that plaintiff suffered no economic loss, or that he failed to mitigate his damages, and that we ought not to speculate on the basis of its award of $2. However, we note that defendant did not argue to the jury that defendant did not suffer any economic loss or that he failed to mitigate his damages.

The order in which the trial court instructed the jury on damages could have left it with the impression that it could not award plaintiff more than $18,513 and that it was to subtract from that amount any income actually earned by plaintiff after he left defendant. Defendant's position at trial was that it fired plaintiff for just cause, *i.e.*, his continual inability to get along with his coworkers. The jury was presented with a jury verdict form that permitted it to award the verdict to defendant and, instead, it rendered a verdict for plaintiff and awarded damages. Our examination of the evidence and the parties' positions at trial in light of the jury's verdict persuades us that it is more likely than not that the court's instruction created an erroneous impression of the law in the minds of the jury that affected its award. ORS 19.125(2). *See also Baker v. English*, 324 Or 585, 590, 932 P2d 57 (1997) (holding that the rights of an aggrieved party are substantially affected if the outcome either would have or may have been different had the error not occurred).

Reversed and remanded.